T.C. Memo. 2018-195

UNITED STATES TAX COURT

KATHRYN J. GILLETTE AND RAIF SZCZEPANSKI, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16626-15L.                    Filed November 20, 2018.

Kathryn J. Gillette and Raif Szczepanski, pro sese.

<u>Nathan M. Swingley</u> and <u>Timothy A. Lohrstorfer</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, <u>Judge</u>:  This collection case was filed pursuant to section 6330(d) to

challenge the Commissioner's notice of determination sustaining a proposed levy

to collect a 2012 Federal income tax liability.[1]  Ms. Gillette and Mr. Szczepanski

---

[1]All section references are to the Internal Revenue Code (Code) in effect at
(continued...)

[*2] argue that they are not liable for the additional tax on an early individual retirement account (IRA) distribution because Ms. Gillette's disability in 2012 qualified her for an exception under section 72(t)(2). They also argue that they are not liable for alterative minimum tax because of Ms. Gillette's prescription drug-induced gambling addiction. Finally they contend that the settlement officer abused his discretion by not accepting Ms. Gillette and Mr. Szczepanski's public policy or equity offer-in-compromise under section 301.7122-1(b)(3)(ii), Proced. & Admin. Regs.

Ms. Gillette and Mr. Szczepanski failed to establish that an exception under section 72(t)(2) applies; therefore they are liable for the additional tax for an early IRA distribution. Additionally Ms. Gillette and Mr. Szczepanski are liable for the alternative minimum tax. Lastly, the settlement officer did not abuse his discretion in denying Ms. Gillette and Mr. Szczepanski's collection alternative.

## FINDINGS OF FACT

Ms. Gillette has served in our military and worked as a firefighter. She also purchased and managed rental properties, accumulating properties for which she

---

[1](...continued)
all relevant times. We round all monetary amounts to the nearest dollar.

[*3] collected rents, managed financials, and performed most maintenance. Ms. Gillette's husband, Mr. Szczepanski, worked as a police officer.

I.      Ms. Gillette's Compulsive Gambling

In the early 2000s Ms. Gillette began taking the prescription medication Mirapex for restless legs syndrome. She continued taking Mirapex until around 2008 when her insurance company required a change to the generic alternative pramipexole.[2] Over the years Ms. Gillette's medication became less effective, and her doctor increased her dosage.

After a particular dosage increase in April 2010 Ms. Gillette began to exhibit severe compulsive behavior, particularly compulsive gambling.[3] The first instance of compulsive behavior occurred when Ms. Gillette and Mr. Szczepanski celebrated Ms. Gillette's retirement from the fire department aboard a cruise ship. On this seven-day cruise Ms. Gillette gambled through the nights; and when she returned home, she began searching for nearby casinos.

---

[2]Pramipexole is the generic version of Mirapex, and they are referred to interchangeably throughout the record. Ms. Gillette testified at trial that she stopped taking Mirapex in 2008.

[3]Ms. Gillette also experienced other compulsive behaviors. Because those other compulsions are unrelated to the tax issues presented in this case, we do not address them further.

**[*4]** From this point Ms. Gillette's gambling activity significantly increased. She began traveling hours from her home to play live casino games, increasing her bets to upwards of $500 on a single play at a slot machine and betting thousands of dollars on a single hand of blackjack. She opened credit lines at various casinos and many were soon in default.

But Ms. Gillette also won big. On one occasion she won roughly $162,000. She left the casino with less, having played and lost a portion of her winnings. She went immediately to another casino that had closed one of her many credit lines and paid off her debt to that casino; the casino then extended her further credit. Days later, without much sleep and without leaving the casino, Ms. Gillette gambled away all of her winnings.

Ms. Gillette's gambling worsened. Occasionally she would go days without sleep and at times slept in her car if she wasn't given a complimentary night's stay at a casino. Other times she would fall asleep at blackjack tables and slot machines only to be awakened by dealers and casino attendants. Nearly all of the money she collected from her rental properties went to casinos. When she ran out of money, she borrowed from friends and didn't pay them back, took money and credit cards from her husband's wallet, and eventually withdrew money from her retirement account in 2012. She neglected her rental properties by failing to

**[\*5]** perform routine maintenance, distanced herself from friends and family, and failed to keep up with her personal well-being.

Eventually Ms. Gillette's compulsive behavior caught up with her financially. She stopped paying her mortgages, property taxes, maintenance expenses, and credit card bills. She received tax sale notices for her rental properties and a sheriff's warrant for unpaid Indiana State taxes. Her rental property business was nearly in ruins.

June 2013 was a turning point for Ms. Gillette. While she was accompanying her son to cosign for a car loan, the manager informed Ms. Gillette and her son that Ms. Gillette would not be able to cosign for her son's loan because many of her properties were in foreclosure and her credit score was far too low. Ms. Gillette's son was alarmed; to his knowledge his mother was always financially responsible. That is when Ms. Gillette's son confronted her about her prescription medication. He looked into the side effects of pramipexole and learned that a known side effect in some individuals is severe compulsive behavior, particularly compulsive gambling.

Ms. Gillette took that information to her doctor, and they developed a plan to take her off the medication. Ms. Gillette began reducing her medication in 2013. Despite reducing her medication and knowing its side effects, Ms. Gillette

[*6] continued to gamble in 2013, 2014, and 2015. She stopped taking pramipexole and stopped gambling in 2015.

## II.     Ms. Gillette and Mr. Szczepanski's 2012 Return

Ms. Gillette and Mr. Szczepanski filed a joint 2012 return in October 2013 after getting an extension. They reported $60,455 in wages, $104,001 from an IRA distribution, $29,335 from pensions and annuities, $126,465 of income from Ms. Gillette's rental properties, and $1,317,348 in gambling winnings. Ms. Gillette also reported $1,315,227 in gambling losses. They reported an $85,231 tax liability that included additional tax of $10,400 for a premature IRA distribution and $17,851 of alternative minimum tax. Withholdings reduced their balance due to $75,954, which they did not pay.

On May 7, 2014, the Commissioner issued to Ms. Gillette and Mr. Szczepanski separate notices of intent to levy for 2012, and they timely requested a hearing. In their request they stated that they wanted to pursue an installment agreement and an offer-in-compromise.

## III.     Collection Hearing

Ms. Gillette and Mr. Szczepanski were notified that their appeal had been assigned to a settlement officer, and they received a letter setting a telephone hearing for December 9, 2014. The settlement officer requested that Ms. Gillette

[*7] and Mr. Szczepanski provide a completed Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, a signed 2013 return, and a completed Form 656, Offer In Compromise.

Ms. Gillette and Mr. Szczepanski provided the settlement officer with a completed offer-in-compromise citing exceptional circumstances. They included with their offer a collection information statement with accompanying financial information, a signed 2013 return, an $11,207 payment, and an explanation of Ms. Gillette's exceptional circumstances. In support of their claim for exceptional circumstances, they included Ms. Gillette's medical records and various documents related to pramipexole and its side effects. Ms. Gillette and Mr. Szczepanski offered to compromise their 2012 liability for $38,968.

The offer was forwarded to an offer examiner. The offer examiner reviewed Ms. Gillette and Mr. Szczepanski's financial information and determined that they had a reasonable collection potential of $813,484. During his conversation with Ms. Gillette the offer examiner informed her that she could satisfy her tax liability by selling two rental properties. Ms. Gillette responded that the remaining properties were for her retirement and argued that she should not be held liable for the 10% additional tax on the early IRA distribution because of her health problems. The offer examiner informed Ms. Gillette that the Commissioner

[*8] waives the additional tax in certain situations and that it should have been dealt with when she filed her 2012 return. He concluded that Ms. Gillette did not meet any of the special circumstances for an offer-in-compromise.

The offer examiner sent Ms. Gillette and Mr. Szczepanski a letter rejecting their offer-in-compromise. In a follow-up letter the offer examiner stated that the reason for his rejection was that Ms. Gillette and Mr. Szczepanski had the ability to pay the liability in full and that Ms. Gillette's special circumstances did not constitute a hardship. The offer was sent back to the settlement officer who agreed with the offer examiner's rejection, stating: "ETA criteria was considered but circumstances did not change the rejection determination."

After attempting to reach Ms. Gillette and Mr. Szczepanski to discuss other collection alternatives, the settlement officer issued a notice of determination for 2012 on May 26, 2015. His determination letter states that he "agreed with the offer examiner[']s determination to reject * * * [Ms. Gillette and Mr. Szczepanski's] offer based on available net equity in real estate" and that Ms. Gillette's "circumstances were considered but did not change the rejection determination."

Ms. Gillette and Mr. Szczepanski filed a timely petition with the Court on June 29, 2015, while residing in Indiana. In their petition they challenge their

[*9] 2012 liability, arguing that the IRA withdrawal was "done to save * * * [Ms. Gillette's] homes from foreclosure", that because of Ms. Gillette's compulsive behavior her "income looked like it was $1.5 million", and that they "had to pay alternative minimum tax which is unfair due to the fact that * * * [Ms. Gillette's] true income was negative when the gambling losses are taken into account". They further argue that Ms. Gillette's "pathological gambling was a singular and extraordinary event due to * * * [her] medication", that "[t]here should be no penalty for early withdraw from an IRA due to a true emergency", and that "[b]ecause of the drug * * * [she] was mentally impaired and incompetent. * * * [She] paid no bills and only gambled with * * * [her] money in 2012." Ms. Gillette and Mr. Szczepanski contend that because of these circumstances they "should be taxed as if * * * [they] had paid * * * [her] bills and the rest of the taxes should be paid by the drug company."

Before the initial trial date the Commissioner filed a motion to remand this case to the Office of Appeals for further consideration. Ms. Gillette and Mr. Szczepanski did not object. In his motion the Commissioner stated that "the settlement officer did not sufficient[ly] address whether petitioners' argument that petitioner Kathryn J. Gillette's gambling problem, which she claims was a side effect of a drug she was prescribed, would be an exceptional circumstance that

[*10] would justify relief on public policy grounds." The motion further stated that "[t]he record does not sufficiently articulate the settlement officer's consideration of the public policy reasons in evaluating the offer in compromise. Because the record is undeveloped, there is not an opportunity for meaningful review." The Court granted the Commissioner's motion. In its order the Court instructed the parties to conduct a supplemental hearing that specifically addressed a public policy or equity offer-in-compromise.

IV.    Supplemental Collection Hearing

In preparation for the supplemental hearing the settlement officer reviewed the documents provided by Ms. Gillette and Mr. Szczepanski; researched Ms. Gillette's prescriptions; reviewed Ms. Gillette and Mr. Szczepanski's 2015 return, which reported roughly $80,000 in gambling income; and researched the procedures and authority for accepting a public policy or equity offer-in-compromise. The settlement officer referenced the Court's remand instructions in his communication with Ms. Gillette and Mr. Szczepanski and frequently consulted with the Commissioner's counsel on the Court's requirements for the supplemental hearing.

The parties held a supplemental collection hearing in Indianapolis, Indiana. An assisting settlement officer conducted the face-to-face hearing with Ms.

[*11] Gillette and Mr. Szczepanski while the original settlement officer participated over the phone. At the hearing Ms. Gillette and Mr. Szczepanski provided more documents and medical research regarding pramipexole, additional medical records concerning Ms. Gillette's compulsive behavior, court documents from proceedings against the pharmaceutical companies and casinos, State of Indiana tax sale notices, and additional financial information.

The settlement officer discussed a public policy or equity offer-in-compromise with Ms. Gillette and Mr. Szczepanski and informed them of the Internal Revenue Manual's (IRM) guidance regarding such an offer. Ms. Gillette supplied further evidence of her compulsive behavior, argued that she had no control over her gambling addiction, and contended that she should not be liable for the alterative minimum tax or the 10% additional tax on premature IRA distributions because of her condition. The settlement officer informed Ms. Gillette and Mr. Szczepanski that he would review the documents for a public policy or equity offer-in-compromise and that if he rejected the offer a supplemental notice of determination would be issued.

On November 30, 2016, the Commissioner issued a supplemental notice of determination sustaining the proposed levy. The settlement officer attached a report detailing his consideration of Ms. Gillette and Mr. Szczepanski's public

**[*12]** policy or equity offer-in-compromise.  His report observes that the side effects of pramipexole, specifically compulsive gambling, have been known since 2006 and that Ms. Gillette made the choice to continue taking the medication.  He reasoned that Ms. Gillette's actions were not reasonable or responsible, a requirement under IRM pt. 5.8.11.2.2(4) (Aug. 5, 2015).  He also concluded that Ms. Gillette and Mr. Szczepanski's arguments were not supported by the IRM and that "[a]s noted in IRM 5.8.11.2.2.1(7) the fact that the taxpayer thinks the law is unfair would not support public policy acceptance" of an offer-in-compromise.

V.    Trial

The Commissioner filed two motions in limine seeking to exclude Ms. Gillette and Mr. Szczepanski's witnesses from testifying.  These witnesses included Ms. Gillette's doctor, accountant, ex-husband, sister, and son; a Veterans' Administration (VA) social worker; the settlement officer; and the Commissioner's counsel.  The Commissioner argued that these witnesses would provide only cumulative evidence.  The motions also argued that the Court's review should be limited to the administrative record.

A hearing was held on the Commissioner's motions the day before trial. The Court granted the motions in part, disallowing testimony from the

**[*13]** Commissioner's counsel; the VA social worker; and Ms. Gillette's doctor, accountant, and ex-husband. The Court denied the motions in all other respects.

Trial was held the next day. Ms. Gillette's and Mr. Szczepanski's testimony included much of the same information and documentation already in the administrative record. Ms. Gillette testified to the process of removing herself from pramipexole and her recovery from compulsive gambling. She explained that, although she was aware of pramipexole's side effects in 2013, she continued taking it until 2015 while she tried different medications to treat restless legs syndrome. She also testified that she continued gambling through 2015.

The settlement officer testified about his review of Ms. Gillette and Mr. Szczepanski's offer at the collection hearing and the supplemental hearing. He informed the Court that during the supplemental hearing he reviewed pramipexole's potential side effects and Ms. Gillette's medical records but ultimately concluded that Ms. Gillette and Mr. Szczepanski's situation did not justify acceptance of a public policy or equity offer-in-compromise.

In their brief Ms. Gillette and Mr. Szczepanski argue that they qualify for an exception to the 10% additional tax on premature IRA distributions under section 72(t). They contend that Ms. Gillette's compulsive gambling was a mental illness caused by pramipexole and is a disability under section 72(t)(2)(A)(iii). They also

**[*14]** argue that the alternative minimum tax "is neither fair nor just" because Ms.

Gillette's compulsive gambling caused an irregularity in her 2012 return. Finally

they state that the settlement officer abused his discretion by disregarding Ms.

Gillette's medical records, basing "his decision to reject Petitioners['] Offer in

Compromise on prejudice rather than facts", and not engaging "in reasoned

decision making when he recommended Gillette's OIC be denied."

OPINION

The questions before the Court are: (1) whether Ms. Gillette and Mr.

Szczepanski are liable for the 10% additional tax on premature IRA distributions

under section 72(t), (2) whether Ms. Gillette and Mr. Szczepanski are liable for the

alternative minimum tax, and (3) whether the settlement officer abused his

discretion in rejecting Ms. Gillette and Mr. Szczepanski's proposed collection

alternative on grounds of effective tax administration, specifically a collection

alternative based on public policy or equity under section 301.7122-1(b)(3),

Proced. & Admin. Regs.

I.    Challenges to the Underlying Liability

A taxpayer may challenge the existence or amount of the underlying tax

liability at a collection hearing, including a self-reported liability on the taxpayer's

original return, if the taxpayer did not have a previous opportunity to dispute the

[*15] liability.[4]  Where the taxpayer properly challenges the underlying liability, the Court reviews the challenge de novo.[5]

During their collection hearing, Ms. Gillette and Mr. Szczepanski challenged the section 72(t) additional tax and the alternative minimum tax. Because they have properly challenged the underlying liability, we review the Commissioner's determination to impose the 10% additional tax and the alternative minimum tax de novo.

A.    Section 72(t) Additional Tax

Generally a 10% additional tax is imposed on a taxpayer who receives an early distribution from a qualified retirement plan.[6]  Section 72(t)(2) provides exceptions to the tax.  At issue here is the exception provided in section 72(t)(2)(A)(iii) for a distribution that is "attributable to the employee's being disabled within the meaning of subsection (m)(7)".

A taxpayer is disabled if he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental

---

[4]Sec. 6330(c)(2)(B); see Montgomery v. Commissioner, 122 T.C. 1, 10 (2004).

[5]Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176, 181-182 (2000).

[6]Sec. 72(t).

[*16] impairment which can be expected to result in death or to be of long-continued and indefinite duration."[7] An individual's substantial gainful activity "is the activity, or a comparable activity, in which the individual customarily engaged prior to the arising of the disability".[8]

Ms. Gillette argues that her gambling addiction falls under two examples enumerated in section 1.72-17A(f)(2), Income Tax Regs. The first is "[d]amage to the brain or brain abnormality which has resulted in severe loss of judgment, intellect, orientation, or memory".[9] The second is "[m]ental diseases (e.g. psychosis or severe psychoneurosis) requiring continued institutionalization or constant supervision of the individual".[10] Notwithstanding these two examples "[a]n impairment which is remediable does not constitute a disability within the meaning of section 72(m)(7)."[11] An impairment is remediable if the taxpayer can treat the impairment "with reasonable effort and safety to himself", and where the

---

[7]Sec. 72(m)(7).

[8]Secs. 1.72-17(f)(1), 1.72-17A(f)(1), Income Tax Regs.

[9]Sec. 1.72-17A(f)(2)(v), Income Tax Regs.

[10]Sec. 1.72-17A(f)(2)(vi), Income Tax Regs.

[11]Sec. 1.72-17A(f)(4), Income Tax Regs.

**[\*17]** taxpayer "will not be prevented by the impairment from engaging in his customary or any comparable substantial gainful activity."[12]

Even accepting that Ms. Gillette suffered an impairment in 2012, we nonetheless find that any impairment was remediable and not a disability under section 72(m)(7). Ms. Gillette was treated in a reasonable and safe manner with the help of her family and medical professionals. She was able to return to managing her rental properties and financial affairs and has not gambled since 2015. Any impairment that affected Ms. Gillette during the year at issue was remediable; she was not disabled under section 72(m)(7) and does not qualify for an exception under section 72(t)(2).

### B.   Alternative Minimum Tax

The alternative minimum tax is imposed in addition to all other taxes under subtitle A of the Code on a taxpayer's alternative minimum taxable income.[13] Alternative minimum taxable income is a taxpayer's taxable income determined

---

[12]Sec. 1.72-17A(f)(4), Income Tax Regs.

[13]Sec. 55(a).

**[*18]** with adjustments under sections 56 and 58 and increased by items of tax preference in section 57.[14]

Ms. Gillette and Mr. Szczepanski's return for 2012 reported an alternative minimum tax of $17,851. They argue that "[i]t is neither fair nor just that Gillette was taxed an alternative minimum tax rate due to her Mirapex-induced gambling" and that this alternative minimum tax "would not have been due under ordinary circumstances". They contend that they should be taxed as if they had paid all of Ms. Gillette's expenses in her real estate business and as if the gambling had never occurred. In their briefing they cite IRS Publication 1, Your Rights as a Taxpayer, to support these positions but cite no other legal authority.

There is no legal authority for exempting Ms. Gillette and Mr. Szczepanski from the alternative minimum tax; therefore, Ms. Gillette and Mr. Szczepanski are liable for the alterative minimum tax.

## II. Collection Action

In addition to challenging the underlying liability, a taxpayer in a collection hearing may challenge the appropriateness of the collection action and raise offers

---

[14]Sec. 55(b)(2).

[*19] of collection alternatives.[15] We review these challenges for abuse of discretion.[16] Ms. Gillette and Mr. Szczepanski challenge the settlement officer's rejection of their public policy or equity offer-in-compromise and his determination to sustain the levy; therefore, we review his determination for abuse of discretion.

## A.    Offer-in-Compromise

The Secretary is authorized to compromise civil tax liabilities arising under the Code.[17] Guidance for the acceptance of such compromises under section 7122 is outlined in the regulations and includes three grounds for the compromise of a liability: (1) doubt as to liability, (2) doubt as to collectibilty, and (3) to promote effective tax administration.[18]

---

[15]Sec. 6330(c)(2)(A)(ii) and (iii).

[16]Sego v. Commissioner, 114 T.C. at 610; Goza v. Commissioner, 114 T.C. at 181-182.

[17]Sec. 7122(a); sec. 301.7122-1(a)(1), Proced. & Admin. Regs.

[18]Sec. 301.7122-1(b), Proced. & Admin. Regs.

**[\*20]** Because Ms. Gillette and Mr. Szczepanski can pay their 2012 liability in full, they argue that the settlement officer failed to consider their offer-in-compromise on the basis of promoting effective tax administration.[19]

## B. Effective Tax Administration

The Commissioner may compromise a taxpayer's liability to promote effective tax administration in two instances.[20] The first is when "collection of the full liability would cause the taxpayer economic hardship".[21] Ms. Gillette and Mr. Szczepanski do not make an argument and would not meet the requirements for an economic hardship offer-in-compromise. Instead their arguments fall under the second instance, a nonhardship public policy or equity compromise.[22]

If there are no grounds for compromise under doubt as to liability or doubt as to collectibility and the taxpayer does not meet the requirements of an economic hardship, the Commissioner "may compromise to promote effective tax

---

[19]See sec. 301.7122-1(b)(3)(ii), Proced. & Admin. Regs.; see also Murphy v. Commissioner, 125 T.C. 301, 320 (2005) ("Section 301.7122-1(b)(3)(ii), Proced. & Admin Regs., makes the ability to make full payment a precondition to any offer in compromise based on effective tax administration."), aff'd, 469 F.3d 27 (1st Cir. 2006).

[20]Sec. 301.7122-1(b)(3), Proced. & Admin. Regs.

[21]Sec. 301.7122-1(b)(3)(i), Proced. & Admin. Regs.

[22]Sec. 301.7122-1(b)(3)(ii), Proced. & Admin. Regs.

[*21] administration where compelling public policy or equity considerations identified by the taxpayer provide a sufficient basis for compromising the liability."[23] Such a compromise is justified if, "due to exceptional circumstances, collection of the full liability would undermine public confidence that the tax laws are being administered in a fair and equitable manner."[24] The taxpayer proposing the compromise "will be expected to demonstrate circumstances that justify compromise even though a similarly situated taxpayer may have paid his liability in full."[25] Notwithstanding these requirements, the Commissioner will not accept an effective tax administration compromise if acceptance "would undermine compliance by taxpayers with the tax laws."[26]

While there is no specific test, the regulations give some guidance as to the types of cases that may be considered under a public policy or equity compromise.[27] They include: (1) a taxpayer with a serious illness requiring hospitalization for a number of years who, at the time, was unable to manage his

---

[23]Sec. 301.7122-1(b)(3)(ii), Proced. & Admin. Regs.

[24]Sec. 301.7122-1(b)(3)(ii), Proced. & Admin. Regs.

[25]Sec. 301.7122-1(b)(3)(ii), Proced. & Admin. Regs.

[26]Sec. 301.7122-1(b)(3)(iii), Proced. & Admin. Regs.

[27]Sec. 301.7122-1(c)(3)(iv), Proced. & Admin. Regs.

[*22] or her financial affairs, including filing tax returns and (2) a taxpayer who learns after an audit that incorrect advice was given by the Commissioner and is now facing additional taxes and penalties because of that advice.[28]

The IRM also lists compelling factors to consider when examining a public policy or equity offer-in-compromise.[29] They include situations where the taxpayer's liability was the result of the Commissioner's processing error, following the Commissioner's erroneous advice or instructions, the Commissioner's unreasonable delay, or the criminal or fraudulent act of a third party.[30] Additionally, accepting a public policy or equity offer-in-compromise may be appropriate where rejecting it would cause a significant negative impact on the taxpayer's community or "the taxpayer was incapacitated and thus unable to comply with the tax laws."[31] A public policy or equity offer-in-compromise is not appropriate unless the taxpayer's argument is based on more than her belief that the tax laws are unfair.[32]

---

[28]Sec. 301.7122-1(c)(3)(iv), Proced. & Admin. Regs.

[29]Internal Revenue Manual (IRM) pt. 5.8.11.2.2.1 (Aug. 5, 2015).

[30]IRM pt. 5.8.11.2.2.1(1), (2), (3), and (4).

[31]IRM pt. 5.8.11.2.2.1(5) and (6).

[32]IRM pt. 5.8.11.2.2.1(7).

[*23] Ms. Gillette and Mr. Szczepanski argue that their public policy or equity offer-in-compromise should be accepted because Ms. Gillette's mental illness was caused by her prescription medication. While Ms. Gillette's circumstances are unfortunate, Ms. Gillette and Mr. Szczepanski did not provide grounds for treating them differently from a similarly situated taxpayer who paid his or her liability in full.[33] Their situation also differs from the examples given in the regulations: Ms. Gillette did not require hospitalization for a number of years, she was able to file her tax returns, she collected rents from her rental properties, and she did not receive incorrect advice from the Commissioner.[34]

Finally Ms. Gillette and Mr. Szczepanski do not meet any of the compelling factors outlined in the IRM. Ms. Gillette was not so incapacitated that she was unable to comply with the tax laws, rejection of their public policy or equity offer-in-compromise would not have had a significant negative impact on their community, and their 2012 tax liability was not caused by an error or delay of the Commissioner or the fraudulent or criminal conduct of a third party.[35]

---

[33]See sec. 301.7122-1(b)(3)(ii), Proced. & Admin. Regs.; see also IRM pt. 5.8.11.2.2(3).

[34]See sec. 301.7122-1(c)(3)(iv), Proced. & Admin. Regs.

[35]See IRM pt. 5.8.11.2.2.1.

**[*24]** C.     Abuse of Discretion

Our review for abuse of discretion is not an independent review of the settlement officer's actions, and we do not substitute our judgment for that of the settlement officer; we only ensure that the settlement officer's decision was not arbitrary, capricious, or without sound basis in fact or law.[36]

The settlement officer's determination must take three things into consideration: (1) verification that the requirements of the applicable law and administrative procedure have been met, (2) issues properly raised by the taxpayer, and (3) whether any proposed collection action balances the need for efficient tax collection with the legitimate concern of the taxpayer that any collection action be no more intrusive than necessary.[37]

Ms. Gillette and Mr. Szczepanski argue that the settlement officer abused his discretion by not engaging in reasoned decision making. They contend that the settlement officer's decision to reject their offer-in-compromise was based on prejudice rather than facts. We disagree.

---

[36]See Klein v. Commissioner, 149 T.C. __, __ (slip op. at 12) (Oct. 3, 2017); Murphy v. Commissioner, 125 T.C. at 320.

[37]Sec. 6330(c)(3).

**[*25]** The record is clear that the settlement officer verified that all requirements of applicable law and administrative procedure had been met. Not only did the settlement officer review Ms. Gillette and Mr. Szczepanski's offer-in-compromise at the collection hearing, but he also reviewed their offer-in-compromise at the supplemental hearing with a specific focus on public policy or equity compromises under section 301.7122-1(b)(3), Proced. & Admin. Regs. The record also shows that the settlement officer considered all of the issues raised by Ms. Gillette and Mr. Szczepanski during their collection hearing and supplemental hearing, answering all of their inquires and explaining the applicable law. And finally the settlement officer determined that the collection action was no more intrusive than necessary.

While we are not disputing Ms. Gillette's medical condition, we conclude that the settlement officer did not abuse his discretion in rejecting Ms. Gillette and Mr. Szczepanski's public policy or equity offer-in-compromise. Ms. Gillette and Mr. Szczepanski did not meet their burden of establishing that acceptance of their public policy or equity offer-in-compromise would not undermine compliance. Additionally we note that their circumstances are not akin to those in any of the examples in the regulations or the compelling factors in the IRM.

[*26] Finally Ms. Gillette and Mr. Szczepanski argue that the settlement officer abused his discretion by failing to forward their offer-in-compromise to the Effective Tax Administration (ETA) Non-economic Hardship Group in Austin, Texas, for consideration. We disagree.

The IRM states that if a settlement officer is considering a public policy or equity offer-in-compromise it "is important that appropriate cases are identified and forwarded" to the ETA Non-economic Hardship Group.[38] But it does not require forwarding for all public policy or equity offers-in compromise, and a settlement officer can reject a public policy or equity offer-in-compromise without forwarding it to the ETA Non-economic Hardship Group.[39] The settlement officer's decision to reject Ms. Gillette and Mr. Szczepanski's offer, without forwarding it to the ETA Non-economic Hardship Group, was within his power under the IRM and was not an abuse of discretion.

III. Conclusion

Ms. Gillette and Mr. Szczepanski failed to establish that they are qualified for an exception to the 10% additional tax on a premature distribution under section 72(t), and they are liable for the additional tax. Ms. Gillette and Mr.

_____

[38]IRM pt. 5.8.11.2.2(1).

[39]See IRM pt. 5.8.11.2.2(1); see also IRM pt. 1.2.44.2.2 (Oct. 28, 2015).

**[*27]** Szczepanski are also liable for the alternative minimum tax. Finally we find that the settlement officer did not abuse his discretion in rejecting Ms. Gillette and Mr. Szczepanski's public policy or equity offer-in-compromise and that his determination has a sound basis in fact and law.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.